1       **UNITED STATES DISTRICT COURT**

2       **EASTERN DISTRICT OF NORTH CAROLINA**

3                                    )
        **UNITED STATES OF AMERICA,**      )
4                                    )   DOCKET NO. 7:25-CR-65-IM
                        **Plaintiff,**    )
5                                    )
        **vs.**                          )
6                                    )
        **TROY EVAN SWINSON,**           )
7                                    )
                        **Defendant.**    )
8       _____

9       **TRANSCRIPT OF PROBABLE CAUSE AND DETENTION HEARINGS**
        **BEFORE MAGISTRATE JUDGE ROBERT B. JONES, JR.**
10              **MONDAY, JUNE 3, 2025; 10:05 AM**
                **WILMINGTON, NORTH CAROLINA**
11

12      **FOR THE PLAINTIFF:**
                United States Attorney's Office - EDNC
13              By:  Charity Wilson
                150 Fayetteville Street
14              Suite 2100
                Raleigh, NC 27601
15

16      **FOR THE DEFENDANT:**
                Federal Public Defender - EDNC
17              By:  Robert Parrott
                150 Fayetteville Street Mall
18              Suite 450
                Raleigh, NC 27601
19
        Audio Operator:              Clerk's Office Personnel
20                          eScribers, LLC
                        7227 N. 16th Street
21                          Suite 207
                        Phoenix, AZ 85020
22                          800-257-0885
                        www.escribers.net
23

        Proceedings recorded by electronic sound recording; transcript
24              produced by transcription service.

25

1                           I N D E X

|                      |        |       |          |         | VOIR |
| WITNESSES:           | DIRECT | CROSS | REDIRECT | RECROSS | DIRE |
| For the Plaintiff:   |        |       |          |         |      |
| Kelly Kucala         | 3      | 17    |          |         |      |
|                      |        |       |          |         |      |
| For the Defendant:   |        |       |          |         |      |
| Jere Swinson         | 19     | 24    |          |         |      |
| Abniel Cejudo        | 32     | 33    | 38       |         |      |

2 WITNESSES:
  For the Plaintiff:
3 Kelly Kucala

4 For the Defendant:
  Jere Swinson
5 Abniel Cejudo

6

| CLOSING ARGUMENTS: | PAGE |
| For the Plaintiff  | 39   |
| For the Defendant  | 45   |

7 CLOSING ARGUMENTS:                                        PAGE
  For the Plaintiff                                         39
  For the Defendant                                         45
8

| RULINGS:           | PAGE | LINE |
| Defendant detained | 55   | 10   |

9 RULINGS:                                         PAGE   LINE
  Defendant detained                               55     10
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kelly Kucala - Direct

```
1                    P R O C E E D I N G S
```

2          MS. WILSON:  Judge, I think we're ready whenever the

3    Court is.

4          THE COURT:  Okay.  I'll hear from the Government

5    first on probable cause.

6          MS. WILSON:  Thank you, Your Honor.  We would call

7    Agt. Kucala.

8            PLAINTIFF'S WITNESS, KELLY KUCALA, SWORN

9          THE CLERK:  Thank you.  And would you please state

10   and spell your name for the court.

11         THE WITNESS:  Sure.  It's Kelly Kucala, K-E-L-L-Y.

12   Last name is Kucala, K-U-C-A-L-A.

13         THE CLERK:  Thank you.

14                     DIRECT EXAMINATION

15   BY MS. WILSON:

16   Q.   Ma'am, where are you currently employed?

17   A.   I am employed at the FBI.

18   Q.   How long have you been with the FBI?

19   A.   For approximately four and a half years.

20   Q.   In your four and a half years with FBI, what have been

21   your main duties and responsibilities?

22   A.   I am the coordinator right now for human trafficking and

23   violent crimes against children.

24   Q.   At some point did you receive a call from the

25   Jacksonville Police Department about a missing fourteen year

Kelly Kucala - Direct

1   old in May of 2025?

2   A.   I did, yes.

3   Q.   Specifically, was that May 20th or 21st, somewhere around

4   that time period?

5   A.   Yes, ma'am.

6   Q.   And what did you understood -- what was your

7   understanding about what had happened with this fourteen year

8   old child?

9   A.   The initial call was that there was a fourteen year old

10  minor who was missing who law enforcement had been contacted

11  by her mother when her service dog alerted that she was not in

12  her bedroom.

13  Q.   The fourteen year old service dog?

14  A.   No, the fourteen year old minor was not in her bedroom.

15  Q.   But the fourteen year old minor had a service dog?

16  A.   Correct, yes, ma'am.

17  Q.   And that service dog started barking in early morning

18  hours and alerted, that's what woke up parents that she was

19  not -- that the fourteen year old was not in the residence

20  anymore?

21  A.   Yes, ma'am.

22  Q.   Do you know why she had a service dog?

23  A.   So she was diagnosed with an autoimmune disorder around

24  the age of nine, and the dog was to assist with that.  Also to

25  help her with anxiety.

Kelly Kucala - Direct

1    Q.    And the dog -- has the dog been with her since 2015?

2    A.    Yes.

3    Q.    After the dog woke up mom of child, what happened then?

4    A.    At that point in time, Mom contacted law enforcement

5    indicating that her child was missing.  When law enforcement

6    arrived, they canvassed the area and located the minor's cell

7    phone face down in the grass near the residence.

8    Q.    And was that around 2:09 in the morning when minor

9    child's mom called the Jacksonville Police Department?

10   A.    Yes, ma'am.

11   Q.    The -- when they found the minor child's phone, did they

12   search her phone?

13   A.    Yes, ma'am.

14   Q.    And was that done with Mom's consent?

15   A.    Yes, ma'am.

16   Q.    What did they find?

17   A.    They located numerous chats through different social

18   media platforms, but one chat stood out.  It was a chat

19   between her and an individual who had the screen name Delarose

20   (ph.).  And in the chat, there was communications about

21   meeting up and her leaving her phone in order to meet up.

22   Q.    Were the chats also sexual in nature?

23   A.    They were, yes.

24   Q.    And during the course of the chat, did the minor child

25   send up close images of her vaginal area to this other user,

Kelly Kucala - Direct

1    Delarose?

2    A.    She did.

3    Q.    In the chats, is it apparent that Delarose and this child

4    had met up at one point before minor child went missing?

5    A.    Yes.

6    Q.    At like a bus station or a park or something like that;

7    is that right?

8    A.    It was at a park, like a pond park near her apartment

9    complex.

10   Q.    From the course of the chats, was it apparent that the

11   minor child would have had her service dog with her when they

12   met up the first time?

13   A.    It is.

14   Q.    And from the chats talking about their previous meeting,

15   did it seem like they had engaged in some kissing or maybe

16   fondling behavior?

17   A.    That's correct, yes, ma'am.

18   Q.    What does this user, Delarose, say about how this

19   interaction would have gone if other people hadn't been

20   around?

21   A.    He indicates that it would have gone further.  That he

22   would have not been able to stop.

23   Q.    Stop what?

24   A.    The -- the physical contact that he was having with the

25   minor.

Kelly Kucala - Direct

1  Q.  Is it clear that there would have been sexual

2  intercourse, or is that implied from the conversation?

3  A.  It's implied; however, they later discuss it.

4  Q.  In this same chat?

5  A.  Yes, ma'am.

6  Q.  And what do you mean by that?  Can you describe those

7  chats?

8  A.  As they continued their conversation, they discuss

9  meeting up at a later time.  Through those discussions, they

10 discuss having sex.  Him performing oral sex on her.  And

11 also, producing material of them engaging in sexual acts

12 together.

13 Q.  So they talk about recording their own sexual behavior

14 during this plan to meet up in the future?

15 A.  Yes, ma'am.

16 Q.  From the chats that we have, is it clear that there were

17 chats before the ones that we've recovered?

18 A.  Yes, ma'am.

19 Q.  And is that clear because they sort of start, like,

20 almost in the middle of a conversation?

21 A.  Yes, ma'am.

22 Q.  And so we know that there are some other chats that are

23 out there that we just haven't recovered yet?

24 A.  That's correct.

25 Q.  From the chats that we have, is it apparent how old the

Kelly Kucala - Direct

1   child said she was?

2   A.   She indicated that she was seventeen years old in the

3   chats.

4   Q.   How did this user, Delarose, respond to her being

5   seventeen?

6   A.   He indicated he did not want to catch a charge.

7   Q.   And was it after that, that the child produced child

8   sexual abuse material of herself and sent the images?

9   A.   Yes.

10   Q.   From the course of the chats, is it apparent that this

11   user, Delarose, believes this child to be in school?

12   A.   He asked her about being in school.  She indicated that

13   at that moment in time, she was not in school but that she

14   hoped she did not have to return.

15   Q.   And also from the chats, do they discuss the child's

16   mother?

17   A.   They did.

18   Q.   In what way?

19   A.   The child was explaining that she has recently attempted

20   to kill herself, and that because of her actions, her mom was

21   being more overbearing and monitoring her more closely.

22   Q.   Does -- do the child and this user, Delarose, discuss her

23   leaving the residence with him?

24   A.   Yes.

25   Q.   Can you describe that for the Court?

Kelly Kucala - Direct

1  A.   Yes.  He indicated that he would come pick her up from

2  the apartment complex once her mom and sister were in bed.

3  They waited for her sister to go to sleep.  In the

4  conversations, he instructs her to leave her phone behind

5  because she had previously told him that her mother tracks her

6  location through her cell phone.  So he instructs her to leave

7  the phone behind so she would not know where she was.

8  Q.   During the course of those chats, does the child indicate

9  that she feels like that that's super risky to do?

10  A.   Yes.

11  Q.   Does she even use that word, like this -- that's risky?

12  A.   Yes, ma'am.

13  Q.   How does he respond to her?

14  A.   He basically tells her that it might be risky, but that

15  she could come up with an excuse of why she was gone.

16  Q.   Did he even say things like risk it and come over

17  tonight?

18  A.   Yes.

19  Q.   And minor victim says, ugh, I can't?

20  A.   Yes, but he continues to pressure her to leave.

21  Q.   Does the user, Delarose, say, you're so close that you

22  can just say you went on a walk or something?

23  A.   Correct, yes, ma'am.

24  Q.   And if you -- even if you get caught, that kind of thing?

25  A.   Yes.

Kelly Kucala - Direct

1    Q.   Now, was it apparent from the chats, that one of the main

2    objectives in meeting up was to have sexual intercourse?

3    A.   Absolutely.

4    Q.   And do they discuss in somewhat graphic detail having

5    oral and vaginal sex?

6    A.   Yes.

7    Q.   Along with other sexual conduct included?

8    A.   Correct, yes, ma'am.

9    Q.   Does the minor child indicate that she's a virgin?

10   A.   She does.

11   Q.   And what does he say about that?

12   A.   That he would take it slow, I believe is what he

13   mentioned, and that he would take care of her during the

14   sexual acts.

15   Q.   Does he say -- do you recall from your review of the

16   texts, does he say, think you can take it; I've got a thick

17   cock?

18   A.   Yes.  And then he also sent a picture of his erect penis

19   as well.

20   Q.   Does the child talk about having to sneak out because her

21   mom had been closely watching her?

22   A.   Yes.

23   Q.   Does he talk about getting her an Uber so that she can

24   come to his residence?

25   A.   They did discuss that, yes.

Kelly Kucala - Direct

1    Q.   After law enforcement found these messages, was the goal

2    to try to identify the user, Delarosa --

3    A.   Yes, ma'am.

4    Q.   -- or Delarose?  And how did they do that?

5    A.   They submitted an exigent request to Snapchat, which was

6    the platform they were talking on.  When they received

7    information about the subscriber, they received a email

8    account that was associated with Delarose.

9    Q.   And was that email account RoyaKari22@gmail.com?

10   A.   RoyaKari22, yes, ma'am.

11   Q.   When the Jacksonville Police Department ran that email

12   address or the name Roya Kari through law enforcement

13   databases, what did they find?

14   A.   They found a previous police report from Goochland County

15   in Virginia.

16   Q.   What was that report about?

17   A.   In 2019, Goochland County Sheriff's Office received a

18   ICAC, which is an internet crimes against children report,

19   indicating that Dropbox had identified an account which

20   possessed child sexual abuse material.  The ICAC report said

21   that there was approximately seventy images of child sexual

22   abuse material on the Dropbox.

23   Q.   And was the username of the Dropbox account Roya Kari?

24   A.   It was.

25   Q.   And was the email account associated with that Dropbox

Kelly Kucala - Direct

1    account TroySwinson4@gmail.com?

2    A.    It was.

3    Q.    At that point, did Goochland County Sheriff's Office

4    obtain a search warrant for that Dropbox account?

5    A.    They did.

6    Q.    And when they received the returns, was there about 20.7

7    gigabytes of data?

8    A.    That's correct, yes, ma'am.

9    Q.    And out of all of the individual files that were closely

10   reviewed, were there 885 files of child sexual abuse material?

11   A.    Yes, but not all the images were viewed.  They only

12   reviewed a portion of them, 4,000 images, and of those, 885

13   were child sexual abuse material.

14   Q.    And there were over 15,000 individual files but not all

15   of those were examined?

16   A.    Correct, yes, ma'am.

17   Q.    Was it obvious that there was a mix of child pornography

18   and adult pornography?

19   A.    Yes.  They indicated that in their report.

20   Q.    The child sexual abuse material, was it made up of both

21   photos and videos?

22   A.    It was.

23   Q.    Goochland County Sheriff's Office, do you know where that

24   investigation lies today?

25   A.    At that time, they went to contact Mr. Swinson, however,

Kelly Kucala - Direct

1    he had joined the Marine Corps and was stationed in 29 Palms.

2    They reached out to NCIS and made an agreement that they would

3    recontact him once he was back in Virginia.

4    Q.   And so if Mr. Swinson were to return to Virginia, could

5    those charges be brought against him in Virginia?

6    A.   My understanding at this point is, yes, ma'am.

7    Q.   Was there also another cyber tip that was located during

8    this investigation from 2016?

9    A.   Yes, ma'am.

10   Q.   In 2016, would Mr. Swinson have been a minor?

11   A.   That's my understanding, yes.

12   Q.   And the 2016 cyber tip, was that from the social media

13   platform, MeetMe?

14   A.   Yes, ma'am.

15   Q.   Are you familiar with MeetMe?

16   A.   My understanding is it's similar to a dating app.

17   Q.   And the cyber tip that came in, was that also in

18   Goochland, Virginia?

19   A.   Yes, ma'am.

20   Q.   And the email account associated with that MeetMe

21   account, was that TroySwinson2@gmail.com?

22   A.   Yes, ma'am.

23   Q.   And were there approximately sixty images of child sexual

24   abuse material uploaded to that platform in 2016?

25   A.   Yes.  That was identified by the actual platform.  There

Kelly Kucala - Direct

1    could have been more.

2    Q.   And to your knowledge, was that never really pursued

3    because Mr. Swinson was a minor at that time himself, under

4    the age of eighteen?

5    A.   Yes, ma'am.

6    Q.   So at that point -- after examining that information,

7    your understanding Jacksonville Police Department felt like

8    Troy Swinson was a probable suspect in the disappearance of

9    this fourteen year old?

10   A.   Yes, ma'am.

11   Q.   Were they able to determine a place of residence for Mr.

12   Swinson?

13   A.   Yes.  He had been since stationed to Camp Lejeune and was

14   living out in town in Jacksonville at an apartment complex

15   nearby the minor victim's.

16   Q.   Do you know how close his apartment complex was to the

17   minor victim?

18   A.   It was very close.  And also stationed next to a underage

19   school as well.

20   Q.   During the evening hours of May the 20th of 2025, did law

21   enforcement begin doing surveillance at Mr. Swinson's

22   residence to see if they could locate the minor victim?

23   A.   They did.

24   Q.   Did they, in fact, locate minor child?

25   A.   Yes.  She and Mr. Swinson were seen exiting his

Kelly Kucala - Direct

1    apartment.

2    Q.   When the minor child was recovered by law enforcement,

3    did she have a forensic interview or at least a brief

4    interview?

5    A.   Yes.

6    Q.   Was she pretty reluctant at that point to share details

7    about what had happened to her?

8    A.   Yes, ma'am.

9    Q.   Was she given the -- or did they at least discuss with

10   her the option of having a physical exam?

11   A.   Yes, ma'am.

12   Q.   During that physical exam, was the minor child asked when

13   the last time she had had sexual intercourse was?

14   A.   Yes.

15   Q.   How did that child respond to that question?

16   A.   She indicated that the last and only time she had had

17   sexual intercourse was with Mr. Swinson.

18   Q.   How did she answer that question?  Did she do that

19   verbally or some other way?

20   A.   She pointed at a indicator for him.

21   Q.   Like his name was written on a piece of paper and she

22   pointed to his name?

23   A.   Yes, ma'am.

24   Q.   And the child as of today is fourteen years old?

25   A.   Yes, ma'am.

Case 7:25-cr-00065-M-RN    Document 18    08/26/25    Page 15 of 56
escribers
www.escribers.net | 800-257-0885

Kelly Kucala - Direct

1    Q.    And the disabilities that have led her to have a service

2    dog are not only this autoimmune disorder, but also some

3    combination of anxiety, depression issues?

4    A.    Yes, ma'am.

5    Q.    Have you been able to examine -- well, let me ask you

6    this.  Was the -- was Mr. Swinson's digital devices seized on

7    or about May the 20th when the minor child was located with

8    him?

9    A.    Yes.  It was located near his bed on a nightstand, I

10   believe.

11   Q.    What happened with that phone?

12   A.    So State obtained a search warrant for that device, and

13   it has since been partially extracted.  That device has not

14   been reviewed, though, at this time.

15   Q.    So a digital forensic examiner has downloaded the

16   contents or at least some of the contents of the phone, but

17   that person has not examined it and those results have not

18   been provided to you yet for you to examine?

19   A.    That's correct, yes, ma'am.

20   Q.    And so all of the information, the charges that he

21   currently faces, have come from the minor victim's phone; is

22   that right?

23   A.    And then the other police reports, yes, ma'am.

24   Q.    The receipt of child pornography, you can tell that on or

25   about May 20th of 2025, minor child sent Mr. Swinson an image

Kelly Kucala - Direct

1    that depicted her unclothed vaginal area?

2    A.   Yes.

3    Q.   And how many images or videos did she send?

4    A.   She sent one image and one four second video.

5    Q.   And then, the online sexual enticement of a minor, those

6    stem from the brief conversations that we have located to

7    date?

8    A.   Yes, ma'am.

9    Q.   Thank you.

10        MS. WILSON:  That's all I have.

11        THE COURT:  All right.  Cross-examination?

12        MR. PARROTT:  Briefly, thank you.

13                    CROSS-EXAMINATION

14   BY MR. PARROTT:

15   Q.   Did you ever ask the minor how she and Mr. Swinson met?

16   A.   No, sir.  So I have not personally met with the minor

17   yet.

18   Q.   Has -- to your knowledge, has anyone asked her how they

19   met?

20   A.   To my knowledge, not at this time.  I have not received

21   at this point the actual video interview.  My only

22   understanding is that she was not overly -- I don't want to

23   say cooperative -- but forthcoming or willing to participate

24   at that time.

25   Q.   Okay.  So she may have been asked; she may not, you --

Kelly Kucala - Cross

1   A.   Correct.

2   Q.   -- just don't know?

3   A.   Exactly.

4   Q.   Okay.

5            MR. PARROTT:  May I have one moment, Your Honor?

6            THE COURT:  Yes, sir.

7            MR. PARROTT:  I have no further questions.  Thank

8   you.

9            THE COURT:  Any redirect?

10           MS. WILSON:  No, sir.

11           THE COURT:  Thank you, ma'am.  You can step down.

12           Anything further from the Government?

13           MS. WILSON:  No, sir.

14           THE COURT:  All right.  For Defense?

15           MR. PARROTT:  Defense would call Jere Swinson as a

16  third party custodian.

17           THE CLERK:  If you would, please, place your left

18  hand on the Bible and raise your right hand.

19           DEFENDANT'S WITNESS, JERE SWINSON, SWORN

20           THE CLERK:  Thank you.  And would you please state

21  and spell your first name for the record?

22           THE WITNESS:  Yes.  It's J-E-R-E.

23           THE CLERK:  Thank you.  And if you'll please take a

24  seat, and make sure you speak loudly because we have the

25  microphone -- it's got a microphone.

Jere Swinson - Direct

```
 1                    DIRECT EXAMINATION

 2   BY MR. PARROTT:

 3   Q.   Good morning, Ms. Swinson.

 4   A.   Good morning.

 5   Q.   Do you understand that Judge Jones is going to decide

 6   today whether or not there is any condition or combination of

 7   conditions that can adequately assure Mr. Swinson's appearance

 8   in court and the safety of the public?

 9   A.   Yes.

10   Q.   And do you understand that if he decides that there are

11   conditions on which Mr. Swinson could be released, that he

12   would set those conditions of release?

13   A.   Yes, I do.

14   Q.   And do you also understand that if Mr. Swinson doesn't

15   comply with those conditions of release, that he'll be

16   immediately arrested?

17   A.   Yes.

18   Q.   Do you understand that he could be charged with an

19   additional offense for committing an offense while on pretrial

20   release?

21   A.   Yes.

22   Q.   Do you understand that as third party custodian, it would

23   be your duty to call the U.S. Probation Office and -- and

24   immediately report any violation of his conditions of release

25   if he were released?
```

Jere Swinson - Direct

1   A.   Yes.

2   Q.   And do you think that you would be able to do that even

3   though it meant that your son would be arrested?

4   A.   Yes.

5   Q.   Do you have any guns in the house?

6   A.   No.

7   Q.   Do you have any drugs in the house?

8   A.   No.

9   Q.   Would you tolerate any guns or drugs in the house?

10  A.   No.

11  Q.   Where do you live?

12  A.   I live outside of Richmond, Virginia in Henrico County.

13  Q.   What's the address?

14  A.   3000 Rudolph Road, Henrico, 23294.

15  Q.   Okay.  And how do you know Mr. Swinson, I should have --

16  A.   He's my son.

17  Q.   Okay.  Do you live in a house?

18  A.   I do.

19  Q.   Can you describe the area?  Is it urban, suburban?

20  A.   It's ur -- suburban, I guess.  I have a huge backyard.

21  It's a two story house.  Three bedrooms, two and a half baths.

22  Q.   Okay.  Does anybody else live there with you?

23  A.   No.

24  Q.   Okay.  What do you do for work?

25  A.   I work in a law firm.  I'm a staff accountant.

www.escribers.net | 800-257-0885

Jere Swinson - Direct

1   Q.   Okay.  What hours do you work?

2   A.   9 -- 8 to 5.

3   Q.   Okay.  Other than those hours, would you be able to

4   supervise Mr. Swinson?

5   A.   Yes.  And I usually go home every day for lunch for an

6   hour.

7   Q.   Okay.  And does he have a room there?  It sounds like he

8   would --

9   A.   Yes.

10  Q.   -- with three bedrooms.

11  Q.   Has he ever stayed with you before?

12  A.   Yes.

13  Q.   And did he grow up in Henrico?

14  A.   No.  We -- I grew up in Hanover in Louisa County -- I

15  mean, Hanover in Goochland County.

16  Q.   Okay.

17  A.   Outside of Richmond.

18  Q.   Okay.  Has he -- but he has lived with you in Henrico

19  County before?

20  A.   Well, he stayed with me there.  He hasn't really lived

21  with me there.

22  Q.   Okay.

23  A.   His dad passed away last year and I moved to Henrico --

24  Q.   Okay.

25  A.   -- at that time.

eScribers

www.escribers.net | 800-257-0885

Jere Swinson - Direct

1   Q.   And to your knowledge, while he was living with you, he

2   was never accused of a crime or charged with a crime?

3   A.   No.  I've never had a visit from any sheriff or

4   anybody --

5   Q.   Okay.

6   A.   -- regarding him.

7   Q.   Okay.  Tell me a little bit about Mr. Swinson.  You -- I

8   think it was mentioned that he was in the Marines?

9   A.   Yes.

10  Q.   Do you know what he did in the Marines?

11  A.   Well, he had different jobs while he was in there.  He

12  did logistics -- the latest job was logistics, providing

13  materials for all the deployments and that type of thing, best

14  I have knowledge of it.  I'm not familiar with all of that.

15  But I know he did very well.  He had a lot of accommodations.

16  He had a lot of medals.  He was put up for many

17  accommodations.  He was going to be put up for a medal of

18  valor recently for deployment he was on and had to pretty much

19  write the book on how to do this deployment.  It had never

20  been done before.  It was on a lift.

21  Q.   Where was the deployment?

22  A.   It was to Nevada but it was for some helicopters that

23  went down in the desert.

24  Q.   Okay.

25  A.   And they had to go retrieve them.

Jere Swinson - Direct

1  Q.   Okay.  And have any -- have you spoken with any of his

2  colleagues in the Marines about his character?

3  A.   I have.

4          MS. WILSON:  Objection.

5          THE COURT:  Overruled.

6          You can answer the question.

7          THE WITNESS:  Okay.

8  A.   I have.  He's had a lot of people come forward to offer

9  support and help.  His first sergeant sent a letter to the

10 prosecutor that was -- I mean, the defendant -- defense

11 attorney that was assigned to him with the military.  Sgt. --

12 Capt. Noguchi (ph.) or something like that.  Panaducci (ph.).

13 He received a letter from the first sergeant on what a great

14 Marine he was.  How hard he worked.  How -- that he was -- had

15 just an exemplary career.

16 BY MR. PARROTT:

17 Q.   Okay.  And you don't have that letter with you --

18 A.   No.

19 Q.   -- presently today?

20 A.   I've been trying to get it but I have not been able to

21 reach him.  I've left him a couple messages.

22 Q.   Okay.  Thank you.

23          MR. PARROTT:  I have no further questions, Your

24 Honor.  Thank you.

25          THE COURT:  Ms. Wilson?

Jere Swinson - Direct

1          MS. WILSON:  Thank you.

2                    CROSS-EXAMINATION

3   BY MS. WILSON:

4   Q.   Ms. Swinson, good morning.

5   A.   Good morning.

6   Q.   How long did you live in Goochland?

7   A.   Twenty-some years or thirty-some years.

8   Q.   And you moved last year?

9   A.   Yes.

10  Q.   In 2024?

11  A.   Yes.

12  Q.   Do you remember what month?

13  A.   June -- May.

14  Q.   And so twenty years before means that you were living

15  there from about 2004?

16  A.   Yeah.

17  Q.   2004ish?

18  A.   That sounds about right.  Or 2000 -- I'd say '2 to '4,

19  somewhere in that range.

20  Q.   Okay.  And what's your son's date of birth?

21  A.   11/8/99.

22  Q.   And so he lived in the residence with you from 2002 or

23  2004, whenever you moved, to the time that he entered the

24  Marines; is that right?

25  A.   Yes.

Jere Swinson - Cross

1   Q.   And what year did he enter the Marines?

2   A.   I'm not sure.   Right after he graduated high school, that

3   following January.

4   Q.   When did he graduate high school?

5   A.   I'm terrible at dates.   Let's see.

6   Q.   You think right around 2018 maybe?

7   A.   Somewhere around there, yeah.

8   Q.   Around there, okay.   And you were not notified in 2016

9   that there had been some allegations of illegal conduct on one

10  of his social media sites?

11  A.   No.

12  Q.   That was -- hearing that -- here Agt. Kucala testified

13  about that.   That would have been a total surprise to you?

14  A.   Yes.

15  Q.   And likewise, hearing about that conduct that happened in

16  2019, that was -- that other cyber tip, that also was a

17  surprise to you?

18  A.   Yes.   Never had any -- anyone talk to us, come to the

19  house, anything.

20  Q.   And is that something you would want to know more about

21  before deciding to be a third party custodian?

22  A.   No.   I feel like I can have things under control at my

23  house.

24  Q.   And if those behaviors are true, if those allegations are

25  true, that in 2016, and then 2019, he was uploading child

Jere Swinson - Cross

1  sexual abuse material, that would have been hidden from you?

2  A.   Yes.

3  Q.   We've talked a little bit about your son being in the

4  Marines.  What's his current status with the Marines; do you

5  know?

6  A.   I think they are -- I don't -- I don't know all the

7  terminology, but I think they're administratively releasing

8  him.

9  Q.   Okay.  Other like a -- an other than honorable discharge?

10 A.   No, I don't think it was dishonorable.

11 Q.   Not dishonorable, but other than honorable?

12 A.   No.  I think it was just a -- I'm trying to think how

13 they phrased it.  Just a -- what was that word.

14 Q.   Well, let me ask you this.  You don't have any

15 expectation that he's going to go back to the Marines?

16 A.   No.

17 Q.   They have separated from him?

18 A.   Yes.

19 Q.   Under whatever circumstances?

20 A.   Yes.

21 Q.   You're not sure the exact term, but they've separated

22 from him?

23 A.   Yes.

24 Q.   Okay.  And when did you find out that he had been alleged

25 of these charges?

Jere Swinson - Cross

1   A.   Well, I think the 21st I finally got a phone call.  We

2   had been looking for him because he wasn't answering his

3   phone.  We'd been trying to contact him.  And we found out

4   that he had been arrested.  And then later that day, I got a

5   copy of the local paperwork that they were charging him with.

6   Q.   How did you find out that he had been arrested?

7   A.   A phone call from the jail.

8   Q.   Okay.  From your son?

9   A.   Yes.

10  Q.   And did you ask him about these charges?

11  A.   No, I have not even seen him since he's been arrested.

12  He's had no attorney to talk to.  We've not been able to see

13  him.  He's been shuffled from one place to the next.  We had a

14  meeting set up with he and an attorney.  We got there for it,

15  and right before we were supposed to meet, he was taken out.

16  It's when he was picked up by the FBI.  So no, I've had no

17  conversations with him other than a little bit on the phone

18  since he's been arrested.

19  Q.   What did he say about his arrest?

20  A.   We haven't had a chance to talk about it.  We're not

21  going to talk about it on the -- the phones on the jail.

22  Q.   Why not?

23  A.   Because, you know, he should be able to sit down with an

24  attorney and talk and give his side of it.  He's not going to

25  do that on the jail phones.

Jere Swinson - Cross

1    Q.    Because you know they're recorded?

2    A.    Yes.

3    Q.    And you don't want him to put himself in a position where

4    there's any other --

5    A.    Of course.

6    Q.    -- evidence against him?

7    A.    That, or you know, say something wrong.  And I don't know

8    what to ask, so you know.  I'm waiting for guidance from his

9    attorneys, and we've yet to have that.

10   Q.    Now, he bonded out on the state charges, right?  So he

11   was arrested on some state charges and he bonded out?

12   A.    Correct.

13   Q.    And then was he immediately picked up by NCIS or was he

14   at his home for some period of time?

15   A.    No, he was picked up by his first sergeant, is the way I

16   believe it happened, and went back to the base.  And they just

17   locked him down at the base in his barracks -- or at the base

18   barracks.  And then they moved him to the brig after that.

19   Like, I think, the next day or something.

20   Q.    And in between those times when he had bonded out of the

21   state court facility, you've not had an opportunity to speak

22   to him over the phone?

23   A.    No.

24   Q.    And did you post that bond, or did somebody else post it?

25   A.    I posted it.

Jere Swinson - Cross

1   Q.   Okay.  How much was his bond?

2   A.   30 -- well, it ended up costing me 3,800.  I think the

3   total was 3 -- 30,000.

4   Q.   Okay.  So it was a little bit more than ten percent of

5   the bond that you had to put down?

6   A.   Um-hum.

7   Q.   Okay.  Did he ever talk to you about having a girlfriend?

8   A.   Yes.

9   Q.   When was the last time that he discussed a girlfriend to

10  you?

11  A.   He talks about his girlfriend all the time.

12  Q.   What's his girlfriend's name?

13  A.   Martha.  I'm not sure of her last name.

14       MS. WILSON:  I'm sorry, Judge.  May I have one

15  minute?

16       THE COURT:  Go ahead.

17       MS. WILSON:  Thank you.

18  BY MS. WILSON:

19  Q.   Is he -- is your son married or divorced?

20  A.   Divorced.

21  Q.   And what's his ex-wife's name?

22  A.   Catalina (ph.) -- was Rackley (ph.).  I mean, she was

23  Swinson but before that she was Rackley.

24  Q.   And Martha, the girlfriend, how long has he been in a

25  relationship with her?

Jere Swinson - Cross

1    A.   For a year.

2    Q.   And have you met Martha?

3    A.   No.  I've spoken with her but I haven't met her in

4    person.

5    Q.   And to your knowledge, are they still in a relationship?

6    A.   Yes.

7    Q.   Okay.  Do you know prior to your son's arrest, how many

8    cell phones he had?

9    A.   No.

10   Q.   I mean, he was not living with you, so that was just not

11   information that you had?

12   A.   No.

13   Q.   Okay.  And you're working for a law firm as an

14   accountant?

15   A.   Yes.

16   Q.   And do you have to report to the office from 9 to 5?

17   A.   Yes.

18   Q.   Okay.  It's not a remote position?  You don't --

19   A.   No.

20   Q.   -- work from your home?

21   A.   No, I don't.  And most weeks I work four days.  I usually

22   have another day.

23        THE COURT:  I'm sorry, do you mind speaking up?  I

24   didn't --

25        THE WITNESS:  I'm sorry.

Jere Swinson - Cross

1          THE COURT:  -- get that last part.

2          THE WITNESS:  I said most days I work -- most weeks I

3    work four days.  I take off one day.  Work on a shorter

4    schedule when we're not busy.

5          MS. WILSON:  Thank you, Your Honor.  That's all the

6    questions I have.

7          Thank you, Ms. Swinson.

8          THE COURT:  Any redirect?

9          MR. PARROTT:  No, Your Honor.  Thank you.

10          THE COURT:  Okay.  Thank you, Ms. Swinson.  You can

11   step down.

12          Anything further from defense?

13          MR. PARROTT:  Yes, Your Honor.  And I'm going to try

14   to pronounce his name.  We would call Abniel Cejudo to the

15   stand.

16          THE CLERK:  Please place your left hand on the Bible

17   and raise your right hand.

18           DEFENDANT'S WITNESS, ABNIEL CEJUDO, SWORN

19          THE CLERK:  Thank you.  And would you please state

20   and spell your name for the court.

21          THE WITNESS:  My name is Abniel Cejudo, A-B-N-I-E-L

22   C-E-J-U-D-O.

23          THE CLERK:  Thank you.

24          MS. WILSON:  I'm sorry, could you repeat the spelling

25   of your last name?

www.escribers.net | 800-257-0885

Jere Swinson - Cross

1          THE WITNESS:  A-B-N-I-E-L.  You mean last name,

2    Cejudo?

3          MS. WILSON:  Last name, yes sir.

4          THE WITNESS:  C-E-J-U-D-O.

5          MS. WILSON:  Thank you.

6                      DIRECT EXAMINATION

7    BY MR. PARROTT:

8    Q.    Good morning, Mr. Cejudo.

9    A.    Good morning.

10   Q.    How do you know Mr. Swinson?

11   A.    I served with him in 29 Palms, California.  We were both

12   Marines.

13   Q.    Okay.  What type of a Marine was he?

14   A.    He was a very good Marine.  The first time I met him, I

15   didn't have a place to stay because I had just gotten married

16   and they weren't giving me a house, and I asked him if I could

17   stay with him.  And he opened his doors to me willingly,

18   indefinitely until I got my house.

19   Q.    Okay.  What's the nature of your relationship?  Would you

20   describe him as a friend?

21   A.    I consider him a brother.  He's been there for me in a

22   lot of dark times that I've had.  He supported me in every

23   major decision I've made.  So I do consider him a brother.

24   Q.    How long have you known him?

25   A.    I'd say about five years now.

Abniel Cejudo - Cross

1    Q.   Okay.  Without commenting on the instant offenses -- and

2    you've obviously heard the prosecution's presentation today.

3    Aside from that or -- does Mr. Swinson engage in any criminal

4    conduct to the best of your knowledge?

5    A.   No, sir.

6    Q.   Okay.  What does he do on a day to day?  You know, when

7    he -- obviously he works during the day for the Marines.  What

8    does he do otherwise?

9    A.   Well, I know he's a -- he has to do something with

10   rigging.  So I -- he does that from, I think, 08 to around

11   1600.  I'm always texting him, checking up how he's doing.

12   Normally when he's off work, he goes for a run.  And then we

13   game for a little bit in the evening.

14   Q.   Game?  Like online games?

15   A.   Yeah, we -- yeah, we play some PS5 games.

16   Q.   Okay.  So in his free time, he runs?

17   A.   He works out, yep.

18   Q.   He works out.  And he plays online videogames --

19   A.   Yes, sir.

20   Q.   -- generally?  Okay.

21         MR. PARROTT:  I don't have any further questions,

22   Your Honor.  Thank you.

23         THE COURT:  Ms. Wilson?

24         MS. WILSON:  Thank you.

25                    CROSS-EXAMINATION

Abniel Cejudo - Cross

1    BY MS. WILSON:

2    Q.    Is it [Say-Jee-doe]?

3    A.    Yes, ma'am.

4    Q.    Okay.  Where are you currently living, sir?

5    A.    I live in Minnesota, Minneapolis -- or St. Paul.

6    Q.    Did you come to North Carolina just for this hearing?

7    A.    I came to help his mom once I heard.  I took a flight and

8    I came down to Virginia.  And then we drove down to North

9    Carolina.

10   Q.    Are you still in the Marines?

11   A.    No, ma'am.

12   Q.    What are you doing for work now?

13   A.    I am currently a student.  I'm pursuing my physical

14   therapy degree.

15   Q.    When are you planning on returning to Minnesota?

16   A.    I plan to return shortly after this hearing.  I'm

17   planning on driving if everything goes well.

18   Q.    Do you think -- well, would you characterize your contact

19   with Mr. Swinson as regular contact?

20   A.    Yes.

21   Q.    And how frequently do you have contact with him?  Like,

22   when things are normal.

23   A.    Almost every day, I text him good morning.  Let him know

24   I'm doing good.  Let him know how my wife's doing.  Kind of a

25   ten minute chat in the morning, and then he goes off to work.

Abniel Cejudo - Cross

1    Q.   When you learned that he had been arrested with these

2    charges, was it a surprise to you?

3    A.   It was, yes.

4    Q.   And was it a surprise when you heard that a fourteen year

5    old was found with him?

6    A.   Yes.

7    Q.   And that there's some allegations that they've had

8    intercourse?

9    A.   Yes.

10   Q.   That is not conduct that would be becoming of a Marine,

11   is it?

12   A.   No, not necessarily.

13   Q.   Well, tell me when it would be.

14   A.   It wouldn't be.  I just never known him or any other

15   Marine to do something like this.  I pride myself in the

16   people I hang around and surround myself with, and it's just

17   something that doesn't seem likely.

18   Q.   It doesn't seem likely or seems shocking?

19   A.   Shocking.

20   Q.   Because you've heard that evidence.  You don't -- well, I

21   guess I'll ask.  Do you have doubt in what Agt. Kucala said,

22   that a fourteen year old was found with him?

23   A.   I don't have doubt.  I believe that he was lied to.

24   Q.   By the child?

25   A.   Yes.

Abniel Cejudo - Cross

1    Q.   So for you, you characterize this as shocking with maybe

2    some explanation?

3    A.   Yes.

4    Q.   But not necessarily an innocent explanation?

5    A.   I don't know what an innocent explanation is.

6    Q.   You are not proposing yourself to be somebody that would

7    watch over Mr. Swinson if this court were to release him on

8    supervision?

9    A.   No, but I would have told his mom that I would make every

10   trip possible to come see her and help her in any way I could.

11   Q.   You met him about five years ago when you were both in

12   the Marines together in California?

13   A.   Yes, ma'am.

14   Q.   And you had not heard anything about any other cyber tips

15   that alleged that he had uploaded child sexual abuse material

16   to social media or Dropbox platforms; is that right?

17   A.   Yes, ma'am, no.

18   Q.   And that was a surprise to hear today?

19   A.   Yes.

20   Q.   And if that is true, if in 2016 and in 2020 he was

21   uploading child sexual abuse material, would that impact how

22   you viewed his overall character?

23   A.   No, it would not.

24   Q.   So it would not make one bit of difference to you if this

25   person that you call a brother had been collecting child

Abniel Cejudo - Cross

1    sexual abuse material?

2    A.   I believe there would be an explanation.  In 2016, he was

3    a minor.  I don't know about the 2019 one.  But I believe that

4    everyone has an explanation.  And I -- that's what I believe

5    currently.

6    Q.   So it would not matter to you one way or another if those

7    allegations were true or not true?

8    A.   No, I still consider him a brother.

9    Q.   Well, sure, but would it impact your view of his

10   character?

11   A.   No, it would not.

12   Q.   And would it impact whether or not you felt like there

13   was a viable explanation for him having sexual intercourse

14   with a fourteen year old?

15   A.   Could you repeat that?

16   Q.   Sure.  Would it alter whether or not there -- you believe

17   that there would be a viable explanation for him having sexual

18   intercourse with a fourteen year old?

19   A.   No.

20   Q.   If he previously had child sexual abuse material?

21   A.   No.

22   Q.   Okay.

23          MS. WILSON:  That's all I have, Judge.

24          THE COURT:  Any redirect?

25          MS. WILSON:  Very briefly, Your Honor.

Abniel Cejudo - Redirect

1                    REDIRECT EXAMINATION

2      BY MR. PARROTT:

3      Q.   Are you familiar with technology?

4      A.   I am.

5      Q.   Okay.  It sounds like you play computer games --

6      A.   Yes, sir.

7      Q.   -- and videogames?  If the Court were to release Mr.

8      Swinson on conditions and require Mr. Swinson not to have any

9      access to the internet or even a cell phone, would you be able

10     to help Ms. Swinson prevent him -- completely cut him off from

11     having access?  Change the passwords to Wi-Fi and whatnot?

12     A.   Of course.

13     Q.   Okay.  And you feel like you would be competent to do

14     that?

15     A.   Yes.  I -- I expressed to Ms. Jere that upon his release,

16     if he gets released, I would do it immediately upon changing

17     her Wi-Fi passwords and making sure that every electronic is

18     out of the house.

19     Q.   Okay.  Thank you.

20              MR. PARROTT:  No further questions.

21              THE COURT:  Any recross?

22              MS. WILSON:  No, sir.

23              THE COURT:  Okay.  Thank you, sir.  You can step

24     down.

25              MR. PARROTT:  Thank you.

Abniel Cejudo - Redirect

1        THE COURT:  Anything further from defense?

2        MR. PARROTT:  No, Your Honor.  Thank you.

3        THE COURT:  All right.  Parties closing argument from

4    the Government.

5        MS. WILSON:  Thank you.  Your Honor, we're here

6    today --

7        THE COURT:  And then could you first tell me what

8    child sexual abuse material is.  What does that mean?

9        MS. WILSON:  Yes.  So child sexual abuse material is

10   the preferred way to discuss child pornography.

11       THE COURT:  So it's child pornography?

12       MS. WILSON:  Yes.  And pretty recently, Congress made

13   that designation.  So the statutes define it as child

14   pornography, but pretty recently, they had passed a bill that

15   it should really be referred to as child sexual abuse

16   material.  And the reason for that is, like, pornography

17   indicates that there is a consensual relationship that is

18   happening, and to refer to it that way really negates the fact

19   that a child cannot consent to that behavior.  And so it is a

20   way to make it very clear that what we're talking about is the

21   rape or the sexual abuse of a child, not a consensual

22   relationship between adults.

23       THE COURT:  But the statute -- 2252 and 42 -- and

24   2422 and 2252 speak to child pornography, correct?

25       MS. WILSON:  That's correct.  And what it is defined

Closing Argument

1    as are images of minors under the age of eighteen that are

2    being depicted in either sexual conduct.  So meaning oral sex,

3    anal sex, vaginal sex, digital penetration, masturbation, or

4    the lascivious exhibition of their genitals, which is a file

5    where the focal point of the image is their genitals, where it

6    is sexually suggestive.  And there are a whole list of factors

7    that courts and juries can take into consideration about

8    whether or not it is a lascivious exhibition of genitals

9    versus just a nude image.

10            And so things like an image being a closeup of

11   somebody's genitals that maybe cuts off their head, or that

12   the picture is only of their genitals, that's something that

13   can be taken into consideration about whether or not it is the

14   lascivious exhibition.  And then the link between the

15   definition and what that statute calls it is that very

16   recently -- and I'm sorry, I don't have that bill number in

17   front of me, but Congress has passed a bill saying that the

18   terms child pornography and child sexual abuse material should

19   be used synonymously in terms of --

20            THE COURT:  Okay.

21            MS. WILSON:  -- the legality of the matter.

22            THE COURT:  Okay.

23            MS. WILSON:  So in terms of probable cause, Your

24   Honor, we are here.  So the Court can determine whether or not

25   there is sufficient probable cause for the complaint that's

Closing Argument

1    been issued.  Your Honor has heard that in May of 2025, that

2    the fourteen year old minor victim had sent images that were a

3    closeup of her vaginal area and then a four second long video

4    that was a closeup of her vaginal area to this defendant.

5    That that information came from her cell phone.

6           That there was the ability to link this defendant

7    specifically with the user Delarose, indicating that he had

8    received that child pornography or child sexual abuse

9    material.  This court should consider one of those as the

10   receipt and one of those as possession.

11          Further, you have heard some extensive testimony

12   about the nature of their conversations.  That there's

13   evidence that this child and Mr. Swinson had met at one time

14   previously.  They had engaged in some behavior, including

15   kissing behavior.  That they had discussed meeting up for

16   sexual purposes.

17          You heard testimony that Mr. Swinson had indicated to

18   the child that she should leave her phone behind so she could

19   not be tracked.  That the child indicated it was risky to

20   leave the house because her mother was overbearing since she

21   had recently attempted suicide.  And that he encouraged the

22   child --

23          THE COURT:  Was -- the testimony was she -- was that

24   she was the mother, or the child?  Who --

25          MS. WILSON:  The child --

Closing Argument

1          THE COURT:  -- had attempted --

2          MS. WILSON:  The child.

3          THE COURT:  -- suicide?

4          MS. WILSON:  The child had attempted suicide.  And

5     that's within the complaint.  Judge, I can find it for you if

6     I can have just a second.  Oh, Judge, it's on page 3 of the

7     complaint.  And it's the fifth line from the bottom.  Minor

8     victim, "Well she's watching me because the whole KMS" is

9     killing myself.  "Thing was three weeks ago and she's making

10    sure" --

11         THE COURT:  The what --

12         MS. WILSON:  -- "I don't" --

13         THE COURT:  What is KMS?

14         MS. WILSON:  Killing myself.

15         THE COURT:  Oh.

16         MS. WILSON:  That's the shorthand.

17         THE COURT:  Okay.  This is on page -- I've got it

18    on -- I've got it on page 4 on CM/ECF.  I see where you are.

19         MS. WILSON:  Okay.  So the child had attempted

20    suicide.  Her mother was watching over her.  And there's some

21    communication about her mother being overbearing.  And then

22    there's conversation about ditching her phone.  That he'll

23    send an Uber.  That he understands it's risky but she should

24    try to do this.

25              And then, further, if we needed another connection

Closing Argument

1   between Delarose and who -- and this defendant, we end up

2   finding the minor victim with him at his apartment.

3           THE COURT:  What was the testimony linking Delarose

4   to Mr. Swinson?

5           MS. WILSON:  So once they found Delarose, they did an

6   exigent --

7           THE COURT:  What is an exigent dump, whatever that

8   was?

9           MS. WILSON:  So I think you're confusing two

10  different things.  There was an exigent request to Snapchat --

11          THE COURT:  Yeah, what's --

12          MS. WILSON:  -- for the --

13          THE COURT:  -- an exigent --

14          MS. WILSON:  -- information --

15          THE COURT:  -- request?  I haven't heard of that one

16  before.

17          MS. WILSON:  So that is an emergency request.  It is

18  done when you believe that there is somebody that is in

19  danger.  Like, at this point, they -- it had every expectation

20  that it was a kidnapping.  And so they were trying to figure

21  out who she had been talking to.  And so they did an exigent

22  request, which gets the information to law enforcement

23  quicker.  And when they did the exigent request, they were

24  able to find that the email that was associated with the

25  Snapchat account of Delarose was Roya Kari.  It's

Closing Argument

1    R-O-Y-A K-A-R-I.

2            And Judge, the page numbers for the complaint that I

3    have are page 9, but it might be for Your Honor page 10.

4            And that that email, when they ran that name, Roya

5    Kari, through law enforcement databases, that's when they find

6    the two different cyber tips.  And those cyber tips that had

7    alleged that a user of Dropbox and then a user of MeetMe have

8    been uploading child sexual abuse material.  Both of the

9    emails associated with those cyber tips were Troy Swinson.

10   One was 2, one was 4, @gmail.com.

11           When they looked up Troy Swinson, they were able to

12   see that there was a Marine that was stationed in Jacksonville

13   at Camp Lejeune that lived very nearby the minor child.  And

14   that when they started doing surveillance on Mr. Swinson's

15   house, they saw Mr. Swinson and the minor child coming out of

16   that residence.  They were able to recover the minor child.

17           And the minor child during the course of her

18   interview, although she was not necessarily the most excited

19   about sharing details about what had happened, she had

20   indicated that she had had sexual intercourse with this

21   defendant.  We know from the text messages that she had said

22   that she was a virgin.  That they had discussed whether or not

23   they could have sexual intercourse in a way that was

24   comfortable.  And so all of -- you know, both her limited

25   statements and all of the text messages that have been laid

Closing Argument

1    out in the complaint, give probable cause for the online

2    sexual enticement of a minor.

3            I would also note for Your Honor that there is

4    potentially additional evidence out there.  Obviously this is

5    a complaint.  This evidence is unfolding.  We've been able to

6    do a partial download of his phone.  It just has not been

7    examined at this point.  However, based solely on information

8    that we have from this investigation to this point, and from

9    the minor child's phone, the Government believes that there is

10   clear evidence of probable cause.  We would ask for you to

11   find probable cause.

12           THE COURT:  All right.  Defense.

13           MR. PARROTT:  Your Honor, we don't intend to

14   challenge probable cause.

15           THE COURT:  Okay.

16           MR. PARROTT:  Thank you.

17           THE COURT:  Next.

18           MS. WILSON:  Your Honor, in terms of detention, some

19   of the factors that this court has to take into consideration

20   are the nature and circumstances of this offense.  There is a

21   fourteen year old child who obviously has had some mental and

22   physical disabilities that led to her having a service dog.

23   That this child had sent this defendant child pornography or

24   child sexual abuse material.  Even if you believe at very best

25   that Mr. Swinson believed that she was seventeen, it is still

Closing Argument

1    child sexual abuse material because she is under the age of

2    eighteen.  He is by all of the child's, encouraging this child

3    to ditch her cell phone.  To leave her house.  He is later

4    located with that child.  And the child has indicated that

5    they had sexual intercourse.

6         Now, Your Honor knows from hearing a number of

7    hearings, hearing a number of arraignments on these type of

8    cases, it is not uncommon that defendants charged with these

9    crimes have family support.  They have friend support.  They

10   are typically educated.  They typically have jobs.  And so all

11   of that weighs in favor of them.  That they have been able to

12   have this life that has been relatively stable.  However, that

13   does not take into account the 2016 cyber tip, the 2020 cyber

14   tip, where there is at least probable cause at this point to

15   believe that in 2016 and 2020, this defendant was uploading

16   and collecting child sexual abuse material.  I don't know a

17   whole lot about that at this point; however, if this court

18   were to release him to go to Virginia, it is quite possible

19   that Virginia could speed up their charges and he could end up

20   being charged with either transportation or possession of

21   child sexual abuse material from that 2019, 2020

22   investigation, which was ongoing at the time that this

23   happened.

24        THE COURT:  What was the -- what was the -- what were

25   the nature of those charges?

Closing Argument

1          MS. WILSON:  So --

2          THE COURT:  I mean, they weren't charges.

3          MS. WILSON:  They're not charged right now.  In 2016,

4    the earlier of the one that we believe that Mr. Swinson would

5    have been a juvenile, MeetMe, which is a social media

6    application, had reported to the National Center for Missing

7    and Exploited Children that one of their users had uploaded

8    approximately sixty images of child pornography.  That was

9    investigated but again, no charges resulted from that.  Then

10   in 2020, the Goochland County --

11         THE COURT:  But how did they identify that it could

12   be Mr. Swinson?

13         MS. WILSON:  Because the email address associated

14   with that social media account was TroySwinson2@gmail.com.

15         THE COURT:  Is that the same one here?

16         MS. WILSON:  It was -- I don't believe we have an

17   email from the Snapchat -- oh, the Snapchat account email was

18   RoyaKari@gmail.com, and that username was the same username

19   from the 2020 Dropbox cyber tip.  Does that make sense, Judge?

20         THE COURT:  Yes.

21         MS. WILSON:  And so the 2020 cyber tip was from

22   Dropbox.  Dropbox notified the National Center for Missing and

23   Exploited Children that one of their users had uploaded

24   approximately sixty images of child pornography -- files of

25   child pornography.  When that account was examined, the email

Closing Argument

1    address associated was TroySwinson4 --

2         THE COURT:  Okay.

3         MS. WILSON:  -- @gmail.com.

4         THE COURT:  All right.

5         MS. WILSON:  That's the one that had like 15,000

6    images --

7         THE COURT:  Right.

8         MS. WILSON:  -- about 4,000 of them were closely

9    examined, and about 885 were obvious child sexual abuse

10   material.  And this is the link, right.  This is the link

11   between consuming this type of material, to later hands on

12   offenses.

13        When you are collecting it and surrounding it --

14   surrounding yourself with it, it breaks down those boundaries.

15   It makes it okay in your own mind to engage in this behavior.

16   And now suddenly we have him at the very best encouraging a

17   seventeen year old to leave her home, to abandon this service

18   dog that obviously is necessary since she's had it since she

19   was nine years old, and to come with him for the purpose of

20   having sexual activity.

21        We know now that she is a fourteen year old.  And I

22   suspect that we will find some additional evidence that helps

23   clarify that.  But even if he believed that she was older, it

24   is certainly -- it should be a concern to this court that for

25   at least nine years, he has been collecting child sexual abuse

Closing Argument

1    material, or has been coming in contact with it.  And that is

2    one thing that this court should be taking into consideration

3    when thinking about his future dangerousness is how long this

4    activity has been going on, and how this behavior, what it

5    says about who he believed that he was dealing with, this

6    juvenile, and whether or not he had a reasonable expectation

7    that she was an adult, which even taking from the best of his

8    text messages, doesn't seem like he ever believed that she was

9    an adult.

10        Judge, the plan is to release him to a different

11   state.  And this court is supposed to have some expectation

12   that he will maintain this court's -- this court's

13   instructions of whatever this court would say is important.

14        Now, you have heard from his mother, who seems to be

15   a lovely human.  She is working hard.  She has tried her best

16   to raise Mr. Swinson.  All of this was shocking to her.  He

17   was able to hide this behavior from her, if Your Honor

18   believes that these other allegations have occurred.

19        And so what the evidence is, is that during the time

20   period that he would have been living with her, there are

21   allegations that he has been uploading child sexual abuse

22   material without her knowledge.  Now, that's not her fault.

23   That's his fault.  And I think that she would do the best to

24   fulfil her obligations, but I think he has put her in such a

25   position, that it's very difficult for this court to be able

Closing Argument

1  to place its trust in him; that he would avoid digital devices

2  and then avoid using those for illegal purposes.  There is

3  nobody else that can watch him while she is at work.

4       This court is familiar with how incredibly easy it is

5  to get digital devices.  To hide those digital devices.  And

6  then to conduct illegal activity.  You're also aware of the

7  devastating impact that it has on children, who are either

8  duped into this behavior long before they are ready to be

9  making these decisions, and how devastating it is for victims,

10  even as they grow into adults, to have their child abuse

11  images on the internet for people to sexually gratify

12  themselves by, and how that makes healing very, very difficult

13  and usually impossible, which sometimes even leads to their

14  own suicidal behavior.

15       Your Honor, we believe that there are no conditions

16  or combination of conditions that can secure this court -- can

17  assure this court that this defendant would not only be a

18  flight risk.  These charges are very serious.  The online

19  enticement is a ten year mandatory minimum.  The receipt of

20  child pornography is a five year mandatory minimum.  That

21  alone gives defendants --

22       THE COURT:  I'm sorry, could you run those by me

23  again?

24       MS. WILSON:  Yes, sir.  The receipt of child

25  pornography carries a mandatory minimum of five years

Closing Argument

1    imprisonment.

2           THE COURT:  Receipt does?

3           MS. WILSON:  Receipt does.  The online enticement of

4    a minor is a ten to life offense.  And when facing those with

5    no real connection in North Carolina --

6           THE COURT:  So that's a presumption.

7           MS. WILSON:  It is.  It is.  Two of the three charges

8    carry a presumption.

9           THE COURT:  Receipt is five years, not less than?

10          MS. WILSON:  Correct.  Not more than twenty years.

11          THE COURT:  And possession is what?

12          MS. WILSON:  A zero to twenty offense.

13          THE COURT:  Okay.

14          MS. WILSON:  And then online enticement is ten to

15   life.  And so Your Honor, for all of those reasons, we are

16   seeking Mr. Swinson's detention prior to trial.

17          THE COURT:  Okay.  All right.

18          MS. WILSON:  Thank you, Your Honor.

19          THE COURT:  Mr. Parrott?

20          MR. PARROTT:  Thank you, Your Honor.  Our probation

21   office in this district is excellent.

22          THE COURT:  They are.

23          MR. PARROTT:  They're thoughtful.

24          THE COURT:  They are.

25          MR. PARROTT:  They're professional.

Closing Argument

1          THE COURT:  Yes.

2          MR. PARROTT:  And they are very, very good at their

3    jobs.

4          THE COURT:  Yes, they are.

5          MS. WILSON:  They're the experts in supervision and

6    they believe that they can supervise Mr. Swinson adequately.

7    I would ask your court -- I would ask this court to place

8    great weight on their expertise and their recommendation.

9          You heard testimony that Mr. Swinson before his

10   arrest was responsive.  I believe his mom said, we were

11   alarmed when we couldn't reach him immediately.  His friend,

12   Mr. Cejudo, also testified that he was responsive.  He would

13   text him every morning.  So I think that that shows that he is

14   someone who will keep in contact with the probation officer.

15         He also has no criminal history.  As Ms. Wilson

16   noted, that's common for these types of offenses, but it's

17   also worth noting.  He has no history of fleeing.  He has no

18   history of other crimes.

19         I would -- I would also note for the court that I

20   think what separates this case from the last one, is we do

21   have a good release plan here.  Ms. Swinson is a responsible

22   adult.  She lives --

23         THE COURT:  The last one?

24         MR. PARROTT:  The previous detention hearing that we

25   discussed.  We -- the point is, we have a good release plan in

Closing Argument

1    this case.  Ms. Swinson is a responsible adult.  Mr. Swinson

2    would be in a different state far, far away from any of the

3    witnesses in this case.

4           And I would add, I think that -- I would ask the

5    Court to consider an additional term of release that's not

6    noted in the presentence report.  I would ask the Court to

7    consider releasing Mr. Swinson on all these conditions,

8    including the home detention program.  But I would also ask

9    the Court to consider ordering him not to be allowed to access

10   the internet because that's one of the common threads I've

11   heard throughout this.  I've heard online hit, online hit,

12   Dropbox, MeetMe.  All these are online apps.  I'm asking you

13   to consider depriving him of access to the internet and

14   ordering him not to have a cell phone.

15          His mother's willing to install a landline so that he

16   could keep contact with his probation officer, and I believe

17   that he's shown that he would do that.  I mean, the Government

18   is essentially standing on the nature of the offense, but all

19   the other factors in the Bail Reform Act line up to suggest

20   that this young man can be supervised.  I ask the Court to

21   consider releasing him on the conditions that Probation's

22   recommending, plus a condition prohibiting him from accessing

23   the internet or having a cellular device.  Thank you.

24          THE COURT:  Okay.  So I've reviewed this case for

25   some time.  Familiar with it since its inception here on the

Closing Argument

1    complaint and the affidavit in support of the warrant.  So I'm

2    familiar with it.

3          I've reviewed the Pretrial Services report.  Probable

4    cause has been found based on Agt. Kucala's unrebutted

5    testimony.  That makes it a case in which the presumption is

6    that Mr. Swinson should be detained before his trial in this

7    case.  I think that that presumption for detention has been

8    rebutted by the testimony of his mother, who has told us under

9    oath that she is willing and able to be a third party

10   custodian.  It is supplemented by Mr. Cejudo's testimony,

11   being a supportive friend and who has volunteered to assist in

12   supervision endeavors.  So presumption's rebutted.

13         Mr. Swinson has no criminal history, so the Court

14   can't say that it is concerned, does not believe based on

15   prior conduct, convictions and such, that Mr. Swinson would

16   demonstrate the same conduct and commit offenses while on

17   release.  And it is true that the recommendation from the

18   probation office is that Mr. Swinson should be released

19   subject to conditions, and additional conditions have been

20   offered by counsel.  But what Probation didn't hear is what

21   we've heard this morning.  Probation didn't have the no

22   internet condition because they didn't -- I would assume,

23   didn't hear the testimony of Agt. Kucala before this morning.

24         And I think what Agt. Kucala told us under oath is

25   very disturbing.  This is, I think, one of the rare cases

Ruling

1    where it's the nature and the circumstances of the offense

2    charged, the weight of the evidence the Government has against

3    Mr. Swinson, the nature and the seriousness of the danger to

4    any person.  We hear there is a person; this minor victim in

5    Jacksonville.  The Court has a serious concern about wherever

6    Mr. Swinson is, other than in jail, of contacting her again.

7         The nature, the words he chose to use, what he said,

8    demonstrates to me conduct that cannot be deterred.  Whether

9    he's in Goochland, whether he's in Henrico, whether he's in 29

10   Palms, wherever, except being detained.  So I'm signing an

11   order to detain Mr. Swinson pending further proceedings.

12        Mr. Swinson, you have every right to appeal my order

13   to the District Court.  I will issue an order this afternoon.

14   And through able counsel, which you have in this case, you can

15   take an appeal of that order to the District Court.

16        Okay.  Anything further regarding Mr. Swinson?

17        MS. WILSON:  Not from the Government.  Thank you.

18        MR. PARROTT:  No, Your Honor.  Thank you.

19        THE COURT:  All right.  Thank you very much.  We're

20   in recess until 3 p.m.

21        THE CLERK:  All rise.  This court will be in recess

22   until 3 p.m.

23                    (Court is adjourned)

24                    *  *  *  *  *

25

```
1                    CERTIFICATE OF TRANSCRIBER

2

3           I, TreLinda Wilson, court-approved transcriber, in

4    and for the United States District Court for the Eastern

5    District of North Carolina, do hereby certify that pursuant to

6    Section 753, Title 28, United States Code, that the foregoing

7    is a true and correct transcript from the official electronic

8    sound recording of the proceedings held in the above-entitled

9    matter and that the transcript page format is in conformance

10   with the regulations of the Judicial Conference of the United

11   States.

12

13                    Dated this 22nd day of August, 2025.

14

15                    /s/ TreLinda Wilson

16                    _____

17                    TRELINDA WILSON, CDLT-148

18                    COURT-APPROVED TRANSCRIBER

19

20

21

22

23

24

25
```

www.escribers.net | 800-257-0885